**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

FATIMA CLIFTON,          )
                                  )     CASE NO. 1:13CV1895
           Plaintiff,       )
                                  )
      v.                        )     MAGISTRATE JUDGE GREG WHITE
                                  )
CAROLYN W. COLVIN,     )
   Acting Commissioner of Social     )     **MEMORANDUM OPINION & ORDER**
   Security,                       )
                                  )
           Defendant.     )

Plaintiff Fatima Clifton ("Clifton") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq.* This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case REMANDED for further proceedings consistent with this Opinion & Order.

## I. Procedural History

On August 17, 2010, Clifton filed an application for SSI alleging a disability onset date of October 1, 2009 and claiming she was disabled due to depression, bipolar disorder, attention

deficit/hyperactivity disorder ("ADHD"), and "sleep troubles."[1]  (Tr. 134-136, 206.)  Her

application was denied both initially and upon reconsideration. (Tr. 88-90, 94-96.)  Clifton

timely requested an administrative hearing. (Tr. 70-71.)

On January 24, 2012, an Administrative Law Judge ("ALJ") held a hearing during which

Clifton, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 27-61)

On May 25, 2012, the ALJ found Clifton was able to perform past relevant work as a salvage

laborer and, alternatively, able to perform a significant number of jobs in the national economy.

(Tr. 13-22.)  The ALJ therefore concluded Clifton had not been under a disability since August

17, 2010, the date she applied for SSI.  (Tr. 21.)  The ALJ's decision became final when the

Appeals Council denied further review.  (Tr. 3-6.)

## II.  Evidence

### Personal and Vocational Evidence

Age thirty-six (36) at the time of  her administrative hearing, Clifton is a "younger"

person under social security regulations.  *See* 20 C.F.R. § 416.963 (c).  She has a tenth grade

education and past relevant work as a salvage laborer.  (Tr. 20, 33.)

### Hearing Testimony

During the January 24, 2012 hearing, Clifton testified to the following:

- She lives with her boyfriend, two children (ages 16 and 14), and her one-year old grandson.  (Tr. 32.)

- She completed the tenth grade, and does not have a GED.  (Tr. 33.)  She was in

---

[1]  Clifton also applied on August 17, 2010 for a period of disability ("POD") and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416(I) and 423 et seq. (Tr. 13.)  These applications were denied initially on August 25, 2010, and Clifton did not appeal. *Id*.  Thus, the ALJ decision addresses only Clifton's application for SSI.  *Id*.

special education classes for a learning disability and ADHD.  (Tr. 47-48.)  She can read a newspaper but does not always understand what she is reading.  Math is "not a good subject for her," although she can add and subtract.  (Tr. 48.)

- She received SSI benefits as a child.  (Tr. 48.)  Her benefits were cut off in 2006 as a result of a felony warrant.  *Id.*  The warrant was later dismissed because she "didn't even know that the stuff was stolen."[2]  (Tr. 49-50.)

- After her benefits were discontinued, a friend started paying her to clean up scrap metal from construction work sites.  (Tr. 37-38, 50.)  Her friend was a construction worker, and he would call her to come help him get the scrap metal and take it to a scrap yard.  (Tr. 37-38.)  Some months she would work every day.  Other times, if she did not feel like working, she would simply not go.  Generally, she would work approximately three days per week for about three to four hours per day.  (Tr. 50-53.)  Before that, she tried to get work through a temporary agency but "it wasn't really a big help" to her.  (Tr. 39.)

- She last worked in 2010.  That year, she earned approximately $15,000 cleaning up scrap metal.  (Tr. 37-38.)

- After her husband was murdered in 2005, she began suffering from depression.  (Tr. 39, 42.)  She has "good days and bad days."  (Tr. 41.)  On a bad day, she feels frustrated and overwhelmed.  *Id.*  She no longer feels interested in the things she used to be.  *Id.*  She has no hobbies and does not belong to any clubs, groups, or organizations.  (Tr. 35.)  She stays in the house more than she used to.  (Tr. 41-42.)  Two weeks out of the month she might experience an "energy burst" and go out of the house. (Tr. 42.)  However, she does not like to be around a lot of people and mostly stays to herself.  (Tr. 42-43, 47.)

-  Her mental condition has deteriorated since 2006.  (Tr. 51.)  Her depression is "definitely worse," and she has also been diagnosed with bipolar disorder.  *Id.*  She has difficulty controlling her anger and experiences mood swings.  (Tr. 51-52.)  She is on probation for domestic violence because she hit her boyfriend with a brick.  *Id.*  She goes to counseling and takes Abilify, Depakote, and Trazodone.  (Tr. 41, 43.)

- She washes the dishes, does laundry "here and there," and sometimes prepares meals.  (Tr. 34.)  She has no difficulty maintaining her own personal hygiene.  (Tr. 34-35.)  She watches television and occasionally reads.  (Tr. 35.)  She visits

---

[2]  While Clifton testified the charges were dropped, the ALJ indicated during the hearing that her records indicated Clifton had pled to a misdemeanor.  (Tr. 55.)  Clifton did not remember pleading to any charges.  (Tr. 55-56.)

her mother nearly every day.  *Id.*  She watches her grandson while her daughter is in school.  *Id.*

• On a typical day, she wakes up at 7:00 a.m., brushes her teeth, takes a bath, feeds her grandson, and watches the news.  She then sleeps for an hour or two, while her grandson is napping.  She later takes her grandson to her mother's house, where she spends the afternoon visiting and watching television.  She goes home when her children get home from school and then they all go back over to her mother's house.  They often eat dinner at her mother's house, or at a local church.  She takes a sleeping pill at 9:00 or 10:00 p.m. and sleeps all night.  (Tr. 35-37.)

• It would be difficult for her to work five days per week because she has "a lot of appointments and different stuff;" she is really tired; and, she is sad. (Tr. 54.)

The VE testified Clifton has past relevant work as salvage laborer, though she noted Clifton may have performed it at the light (rather than medium) level.  (Tr. 56-57.)  The VE also stated that "[i]t's kind of an accommodated job" because "her friend actually gave her the work based on her need."  (Tr. 56-57.)  The VE later clarified that "maybe accommodation isn't quite the right term, but she was working because this friend gave her the work" and "no other employer would permit her to" work on and off.  (Tr. 57-58.)

The ALJ then posed the following hypothetical:

Okay. I just want you to assume a few things.  Assuming we had a person of the same age, education, and employment background as Ms. Clifton.  And this person was able to perform a full range of work except that this person would be performing simple, routine tasks with simple, short instructions, making simple work related decisions, and having few workplace changes.  This person was having minimal public contact and superficial contact with coworkers and supervisors.

(Tr. 58.)  The VE testified the individual would be able to perform Clifton's past relevant work, and would also be able to perform the jobs of hand packager (medium, unskilled); laundry worker (medium, unskilled); and, cleaner housekeeper (light, unskilled).  (Tr. 58-59.)  The ALJ then added to the above hypothetical the limitation that the individual "is unable to work in close

4

proximity to others."  (Tr. 59.)  The VE testified such a limitation would not impact the laundry

worker or cleaner housekeeper jobs, but "might impact" the hand packager job.  (Tr. 59.)

The ALJ then added the limitation that the hypothetical individual would miss work at

least three times per month.  (Tr. 59.)  The VE testified "such a person would not be able to

sustain those jobs full-time or any other full-time job."  *Id.*  Clifton's attorney then added to the

first hypothetical the limitation that the individual would be off-task 20 percent of the time.  (Tr.

60.)  The VE testified such a person would be unemployable.  (Tr. 60.)

### III.  Standard for Disability

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v.*

*Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a

claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and

416.1201. The entire process entails a five-step analysis as follows: First, the claimant must not

be  engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe

impairment."  A "severe impairment" is one which "significantly limits ... physical or mental

ability to do basic work activities."  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the

impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404,

Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work

experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's

impairment does not prevent the performance of past relevant work, the claimant is not disabled.

For the fifth and final step, even though the claimant's impairment does prevent performance of

past relevant work, if other work exists in the national economy that can be performed, the

claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ found Clifton established medically determinable, severe impairments, due to

major depression and ADHD; however,  her impairments, either singularly or in combination,

did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 13-18.)  Clifton was

determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work.

(Tr. 18-20.)  The ALJ determined Clifton was capable of performing past work activities and,

alternatively, used the Medical Vocational Guidelines ("the grid") as a framework and VE

testimony to determine she was not disabled.  (Tr. 20-22.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists

in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d

762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Hook v. Astrue*, 2010 WL

7

2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *Failure to Address Listing 12.05C at Step Three*

Clifton argues the ALJ unreasonably failed to consider the requirements of Listing 12.05C regarding mental retardation.  She emphasizes evidence indicating she has a valid performance IQ of 69; attended special education classes; dropped out of school after the 10th grade; and, received SSI benefits as a child.  Clifton further notes the findings of psychological consultative examiner Joseph Konieczny, Ph.D, that she showed moderate deficits in her overall level of judgment and would appear to require some degree of supervision and monitoring of her daily activities and financial affairs.  Based on the above, and the fact that her depression constitutes an additional impairment imposing a significant limitation of function, Clifton argues the ALJ was required to consider Listing 12.05C at step three.  (Doc. No. 15 at 10-11.)

The Commissioner argues the record does not support "an inference that [Clifton] had an impairment that potentially satisfied § 12.05C because of mental retardation."  (Doc. No. 16 at 14-15.)  She asserts that (1) Clifton's IQ score, standing alone, is insufficient to satisfy Listing 12.05C; (2) her "purportedly poor academic functioning" does not warrant a finding of onset of subaverage intellectual functioning before age 22; and, (3) there is no evidence in the record of significant adaptive skills limitations.  Thus, the Commissioner maintains "[t]he ALJ was under no obligation to evaluate [Clifton's] claim under § 12.05C because neither [her] contended basis of disability nor the medical record showed that she was mentally retarded." (Doc. No. 16 at 18.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§

8

404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 2010 WL 2294531 at * 3 (6th Cir. June 7, 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). In other words, a claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). A claimant must satisfy all of the criteria to "meet" the listing. *Id*.; *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). However, a claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). An ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 3-4 (6th Cir. April 1, 2011); *Hunter v. Comm'r of Soc. Sec.*, 2011 WL 6440762 at * 3-4 (N.D. Ohio Dec. 20, 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *See Reynolds,* 2011 WL 1228165 at * 4-5; *Marok v. Astrue*, 2010 WL 2294056 at *3 (N.D. Ohio Jun. 3, 2010); *Waller v. Comm'r of Soc. Sec.*, 2012 WL 6771844 at * 3 (N.D. Ohio Dec. 7, 2012); *Keyes v. Astrue*, 2012 WL 832576 at * 5-6 (N.D. Ohio March 12, 2012).

Listing 12.05C describes the circumstances in which mental retardation (now called

9

"intellectual disability") is severe enough to preclude gainful activity.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.   This listing provides, in pertinent part, as follows:

> **12.05 Mental Retardation**: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  The Sixth Circuit has clarified that a claimant will meet the above listing only if the claimant's impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria.  *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00(A) as amended by 65 Fed. Reg. 50746, 50776 (August 21, 2000)) (emphasis added).  *See also Turner v. Comm'r of Soc. Sec.*, 2010 WL 2294531 at * 3 (6th Cir. June 7, 2010); *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 697-98 (6th Cir. 2007).

Here, at step two, the ALJ found Clifton suffered from the severe impairments of major depression and ADHD.  (Tr. 16.)  At step three, the ALJ considered whether Clifton met or medically equaled the requirements of Listing 12.04 regarding Affective Disorders, and concluded she did not.  (Tr. 16-18.)  The decision contains no discussion, however, of whether Clifton satisfied the requirements of Listing 12.05.

The record contains the following evidence relating to Clifton's intellectual functioning.

10

On November 15, 2007, Clifton underwent a psychological consultative examination with Richard C. Halas, M.A.  (Tr. 288-295.)  She reported being in special education classes "because of behavior problems" and dropping out in the 10th grade because she "had been in many fights and was always being suspended."  (Tr. 290.)  Clifton also indicated her grades were "mostly below average" and she had failed the 9th grade.  *Id.*  She stated she took GED classes at Cuyahoga Community College, but had failed the pretest.  *Id.*  On examination, Dr. Halas noted Clifton's speech was "slow and constricted."  (Tr. 288.)  He further observed she was unable to do simple calculations and concluded her "general intelligence level is estimated to be in the low average range."  (Tr. 290.)

As part of this examination, Clifton underwent the Wechsler Adult Intelligence Test- III ("WAIS-III").  (Tr. 291-295.)  Her verbal IQ was 81; performance IQ was 69; and, her full scale IQ was 74.  (Tr. 294.)  Dr. Halas diagnosed major depression; ADHD; and, borderline intellectual functioning.  (Tr. 293.)  He found Clifton was moderately impaired in her mental ability to follow through with simple one and two step instructions; but had no impairment in her ability to maintain attention to do simple repetitive tasks.  *Id.*

Clifton returned to Dr. Halas for another consultative examination on December 3, 2008. (Tr. 297-300.)  At this time, Clifton reported "severe behavior disorders" during school and indicated she had dropped out in the 10th grade because of "fights."  (Tr. 298.)  She stated her grades in school were mostly D's and F's and she had failed the 9th grade twice.  *Id.*  Dr. Halas again noted that Clifton's speech was "slow and constricted;" that she was unable to do simple calculations; and that her "general intelligence level was estimated to be in the low/average range."  (Tr. 297-298.)  He again diagnosed major depression; ADHD; and, borderline intellectual

11

functioning.  (Tr. 300.)  Dr. Halas concluded Clifton was moderately impaired in her ability to follow through with simple one and two-step instructions and/or directions due to her "borderline intellect;" and, mildly impaired in her ability to do simple, repetitive tasks.  *Id.*

In December 2008, state agency psychologist Karen Steiger, Ph.D., reviewed Clifton's medical records and completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique.  (Tr. 301-318.)  Dr. Steiger noted Clifton was alleging disability due to Attention Deficit Disorder and Learning Disability ("LD") and that she had reported being in special education classes in school and having "a hard time understanding, comprehending, and keeping up pace."  (Tr. 317.)  She acknowledged Clifton's previous IQ testing and Dr. Halas' 2007 consultative examination report and accorded them "great weight."  *Id*.  Dr. Steiger concluded Clifton was moderately limited in her abilities to understand, remember, and carry out detailed instructions; and, maintain attention and concentration for extended periods.  (Tr. 315.)  She determined Clifton did not satisfy the requirements of Listing 12.05, but did suffer the medically determinable impairment of borderline intellectual functioning.[3]  (Tr. 305.)

In December 2010, Clifton underwent a consultative psychological examination with J. Joseph Konieczny, Ph.D.[4]  (Tr. 371-376.)  She stated she had repeated the 9th grade and had been "involved in 'slow learning-behavior class' throughout her entire educational experience."  (Tr.

---

[3]Dr. Steiger also assessed whether Clifton met the requirements of Listings 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorders).  (Tr. 302, 304.)  She concluded Clifton did not satisfy these Listings but did have the medically determinable impairments of ADHD and major depression. *Id.*

[4]Dr. Konieczny's report indicates the date of evaluation was October 23, 1975, which is Clifton's date of birth. (Tr. 371.)  As both parties indicate in their Briefs that Dr. Konieczny evaluated Clifton in December 2010, the Court assumes this to be the case for purposes of this Opinion.

372.)  In addition, Clifton reported dropping out of school in 10th grade because "I got into a lot of fights."  (Tr. 371-372.)  Dr. Konieczny found that, overall, Clifton "seemed quite capable of expressing herself in a clear and coherent manner."  (Tr. 373.)  He found she did have "some difficulty performing a serial three subtraction task, making at least one error in her responses," noting "her responses were quite slow and she used her fingers to aid in her calculations."  *Id*. Although Dr. Konieczny found her insight into her situation "seemed fair," he concluded Clifton "showed moderate deficits in her overall level of judgement" and indicated she "would appear to require some degree of supervision and monitoring in the management of her daily activities and in handling her financial affairs."  *Id*.  He diagnosed depressive disorder, not otherwise specified and assessed a Global Assessment of Functioning ("GAF") of 52.[5]  (Tr. 374.)

In May 2011, state agency physician Caroline Lewin, Ph.D., reviewed Clifton's medical records and completed a Mental RFC Assessment and Psychiatric Review Technique.  (Tr. 83-86.)  Dr. Lewin acknowledged Dr. Halas' November 2007 and December 2008 reports but declined to accept his opinions regarding Clifton's mental functioning "due [to] the time that has elapsed."  (Tr. 84.)  However, she noted that she had considered the data from Clifton's November 2007 IQ testing.  *Id*.  Dr. Lewin then assessed whether Clifton satisfied the requirements of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders),

---

[5]The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Association, 4th ed revised, 2000) ("DSM-IV").  An individual's GAF is rated between 0 - 100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See DSM-IV* at 34.  It bears noting, however, that a recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

13

concluding she did not.  (Tr. 83-84.)  She did not evaluate whether Clifton satisfied the requirements of Listing 12.05C, despite Clifton's 2007 IQ scores.

In her Mental RFC Assessment, Dr. Lewin concluded Clifton had moderate social interaction limitations but found she could "complete a variety of multistep tasks in a setting whether relating is occasional and superficial."  (Tr. 85.)  She also offered that Clifton was moderately limited in her ability to respond appropriately to changes in the work setting but that she could "complete tasks in a setting that does not have stringent time or production requirements and infrequent change." (Tr. 86.)

In addition to the above evidence, Clifton reported in an August 2010 Function Report that "my conditions has [sic] been this way since starting school have always had a learning problem, and ADHD as a child."  (Tr. 197.)  She also stated "its tough remembering a lot at once and I have to hear something more than one [sic] to understand."  (Tr. 201.)  In response to a question regarding how well she follows spoken instructions, Clifton responded "sometimes I can follow sometimes I need more exspaining [sic]."  *Id.*

During the hearing before the ALJ on January 24, 2012, Clifton reported she had been in special education classes for a learning disability and ADHD.  (Tr. 47-48.)  She stated she dropped out after the 10th grade and had not obtained a GED.  (Tr. 33.)  Clifton reported being able to read, but stated "[w]hether I understand what they're talking about, now it all depends on what I'm reading."  (Tr. 47-48.)  She stated she can make change and can "add and subtract regular stuff" but "if I had to do like a percentage or something, I, I wouldn't like, I've never had that."  (Tr. 48.)  Clifton also testified she received SSI benefits as a child, though she did not indicate for what condition.  (Tr. 49-50.)  She reported past unskilled work as a salvage laborer

14

and some temporary jobs. (Tr. 37-39, 56-57.)

As noted above, the ALJ considered whether Clifton met or equaled the requirements of Listing 12.04 (Affective Disorder) but offered no discussion or analysis with regard to Listing 12.05. In fact, nowhere in the decision does the ALJ discuss Clifton's IQ scores or any of the evidence noted above regarding Clifton's placement in special education classes; failure to graduate or obtain a GED; or alleged behavior issues at school. Clifton maintains this was error, arguing the evidence supports each of the requirements set forth in Listing 12.05C.

In *Abbott v. Sullivan*, 905 F.2d 918, 924-925 (6th Cir. 1990), the Sixth Circuit held the Appeals Council erred when it failed to consider whether the claimant met or equaled the requirements of Listing 12.05 where the record contained evidence of an IQ score of 56. Several district courts within the Sixth Circuit (including the Northern District of Ohio) have construed *Abbott* to stand for the proposition that "'an ALJ's failure to follow the procedural requirement of explaining in the narrative decision why a claimant with IQ scores under 70 does not have an impairment or combination or impairments that meets or equals the definition of mental retardation under § 12.05(C) is grounds for remand.'" *Gibson v. Colvin*, 2013 WL 3733516 at * 8-9 (E.D. Ky July 15, 2013) (quoting *Fury v. Comm'r of Soc. Sec.*, 2012 WL 4475661 at * 2 (N.D. Ohio Sept. 26, 2012)). *See also Roberson v. Comm'r of Soc. Sec.*, 2012 WL 1095953 at * 2 (N.D. Ohio March 30, 2012)(Baughman, M.J.) (holding that "when presented with an on-the-record IQ score of below 70, the ALJ must take notice of such a score and then 'articulate reasons why such a score does or does not give rise to a finding of disability under the listing'")(quotations omitted); *Warren v. Comm'r of Soc. Sec.*, 2011 WL 1085884 at * 2 (N.D. Ohio March 22, 2011) (holding that "in cases where there is evidence in the record of one criteria

15

for establishing disability, the lack of articulated reasons by the ALJ as to why there is no

disability under the listing denotes a lack of substantial evidence in support of the decision, even

where the conclusion may otherwise be justified by later recourse to the entire record"); *Stearns*

*v. Comm'r of Soc. Sec.*, 2011 WL 1097638 at * 2 (N.D. Ohio March 22, 2011); *Foster v. Comm'r*

*of Soc. Sec,* 2013 WL 5406663 at * 2 (N.D. Ohio Sept. 25, 2013).  "This is so even where the

claimant has not argued § 12.05C administratively."  *Foster*, 2013 WL 540663 at * 2.  *See also*

*Fury,* 2012 WL 4475661 at * 1-2; *Warren*, 2011 WL 1085884 at * 3.

Recently, other district courts within this Circuit have backed away from the position that

*Abbott* created a brightline rule requiring an ALJ to consider Listing 12.05C whenever there is an

IQ score under 70.  *See e.g. McClellan v. Astrue*, 804 F.Supp.2d 678, 690-691 (E.D. Tenn. 2011).

In *McClellan*, the court reasoned as follows:

> In *Abbott,* the court held, based on the claimant's IQ score alone, that the
> Commissioner erred in failing to consider listing 12.05.  *Id*. at 924–25.  According
> to Plaintiff, *Abbott* stands for the proposition that "evidence that the [c]laimant's
> IQ is in the range of 60–69 requires that the [Commissioner] explicitly consider"
> listing 12.05C [Doc. 13 at 5].  [footnote omitted]  The *Abbott* court, however, did
> not hold that a qualifying IQ score will always trigger the ALJ's duty to consider
> the listing for mental retardation.  Rather, the court held, given the facts of that
> case, that the claimant's IQ score raised a "substantial question" as to whether the
> listing was met.  *Id*. at 925.  Central to the *Abbott* court's analysis was the
> observation that a claimant with additional severe impairments may qualify for
> the listing solely on the basis of an IQ score less than 70, without any assessment
> of her degree of functional impairment.  *Id*. at 924.
>
> Since *Abbott* was decided, however, the Sixth Circuit Court of Appeals ("Sixth
> Circuit") clarified that a qualifying IQ score, even in combination with other
> "severe" impairments, does not, without more, satisfy the listing.  *Foster*, 279
> F.3d at 354.  Instead, a claimant must also meet the elements of the listing's
> "diagnostic description"—viz., "significantly subaverage general intellectual
> functioning with deficits in adaptive functioning before age 22."  *Id*. at 354–55
> (internal quotes omitted).  In light of *Foster*, **I CONCLUDE that an IQ score of
> 70 or less may not always raise a substantial question as to whether a
> claimant is mentally retarded.**

16

*McClellan,* 804 F.Supp.2d at 690-691 (emphasis added). Rather, the court went on to consider whether the claimant had raised a substantial question as to whether each of the requirements set forth in Listing 12.05 had been met. Since the *McClellan* decision, other district courts have followed the same approach.[6] *See Smith v. Colvin*, 2013 WL 4591501 at * 7 (E.D. Tenn. Aug. 28, 2013); *Hall v. Astrue*, 2012 WL 6924162 at * 7 (E.D. Tenn. Dec. 11, 2012).

In a recent unreported decision, the Sixth Circuit appears to have adopted the "substantial question" approach taken by *McClellan, supra.* In *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. Appx. 639 (6th Cir. Nov. 20, 2013), Sheeks based his disability claim on his intellectual disabilities, anxiety, seizures, insomnia, chest pain, carpal tunnel syndrome and enlarged prostate. *Id.* at * 640. He did not specifically argue that he met or equaled Listing 12.05C during the administrative proceedings and, in denying his claim, the ALJ failed to address the issue. *Id.* at * 641. On appeal, Sheeks argued the ALJ erred in failing to consider whether he met or equaled Listing 12.05C. The district court affirmed the denial of benefits and the Sixth Circuit concurred, reasoning as follows:

> At issue here is listing 12.05(C), which covers mental retardation (now called intellectual impairment). The listing contains four requirements: (1) "significantly subaverage general intellectual functioning," (2) "deficits in adaptive functioning," (3) evidence that the condition began before age twenty-two and (4) a valid IQ score of seventy or below along with a "physical or other mental impairment imposing an additional and significant work-related limitation." 20 C.F.R., Pt. 404, Subpt. P., App. 1, § 12.05(C).

---

[6] In *Fury*, Judge Adams of the Northern District of Ohio recognized the disagreement among district courts on this issue. *Fury*, 2012 WL 4475661 at * 3. However, Judge Adams held that, while the argument that a claimant's IQ alone "may not be enough to mandate a remand may have merit, it is not an argument that this Court is required to decide at this time." *Id.* That was so because, in *Fury*, "Plaintiff has pointed to evidence that could create an issue" as to whether he could satisfy the requisite elements of Listing 12.05C.

The ALJ's decision does not discuss listing 12.05(C).  In defense of the ALJ, Sheeks did not mention the listing in the administrative proceeding.  He raised it for the first time at the district court and has stayed the course in pressing it here.  The government does not claim that Sheeks has forfeited the argument.  Because a potential forfeiture may itself be forfeited, *see United States v. Turner*, 602 F.3d 778, 783 (6th Cir.2010), we (like the district court) may decide whether the listing applies to this case.

The relevant regulations require the ALJ to find a claimant disabled if he meets a listing.  Yet they do not require the ALJ to address every listing—and with ample reason.  There are a hundred or so listings.  **In the normal course, as a result, the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ.  If, however, the record "raise[s] a substantial question as to whether [the claimant] could qualify as disabled" under a listing, the ALJ should discuss that listing.** *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990).

Sheeks claims that the record raises a "substantial question" over whether he meets 12.05(C)—the mental-retardation listing.  In doing so, he notes that the ALJ's finding that he had borderline intellectual functioning, a lesser diagnosis than mental retardation, does not rule out the possibility of a finding of mental retardation.  That is true, as the Commissioner concedes.  But Sheeks must do more than show that the ALJ's decision leaves open the question whether he meets listing 12.05(C).  **He must show that the open question is a substantial one that justifies a remand**.  *Abbott*, 905 F.2d at 925.  He has not done so.

Sheeks makes only a tenuous case for meeting listing 12.05(C). Take his evidence in support of the listing's third requirement: onset before age twenty-two.  As to "significantly subaverage general intellectual functioning," Sheeks points only to his special education classes and his failure to finish high school.  Sheeks testified that he attended special education classes "in elementary school" because he "couldn't see [and] couldn't pay attention" as a child.  AR at 45.  Yet Sheeks did not attend special education classes in high school.  And while he did leave high school in the eleventh grade, he eventually earned a GED.  As to "deficits in adaptive functioning," Sheeks does not flag any record evidence suggesting he had trouble caring for himself or handling social situations before age twenty-two.  *See West v. Comm'r of Soc. Sec.*, 240 Fed.Appx. 692, 698 (6th Cir.2007) (suggesting that adaptive functioning refers to the "claimant's effectiveness in areas such as social skills, communication, and daily living skills").  A substantial question about whether a claimant meets a listing requires more than what Sheeks has put forth here, a mere toehold in the record on an essential element of the listing.  The ALJ thus did not commit reversible error in failing to discuss the listing.

18

*Sheeks*, 544 Fed. Appx. at 641-642 (emphasis added).[7]

Although it is an unreported decision and does not directly address the conflicting positions taken by district courts within this Circuit, the Court interprets *Sheeks* as endorsing the "substantial question" test set forth in *McClellan, Hall*, and *Smith, supra*. Upon careful review of the record, the Court finds Clifton has raised a substantial question as to whether she has met or equaled each of the requirements of Listing 12.05C.[8] As an initial matter, Clifton has shown "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function," in accordance with Listing 12.05C. Clifton underwent IQ testing in November 2007 during which she scored a performance IQ of 69; a verbal IQ of 81; and a full scale IQ of 74.[9] (Tr. 294.) The regulations specify that, "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D6c. Thus, the Court considers Clifton's performance IQ of 69 in determining that she has raised a substantial question as to whether she has met this component of the Listing.

---

[7]Although not mentioned in the Sixth Circuit decision, the Report & Recommendation indicated Sheeks had a verbal IQ of 78, a performance IQ of 70, and a full scale IQ of 72. *See Sheeks v. Comm'r of Soc. Sec.*, Case No. 2:11CV15457 (E.D. Mich) (Doc. No. 24 at 16).

[8] Like the claimant in *Sheeks*, Clifton failed to raise the issue of Listing 12.05C before the ALJ. She did, however, raise it before the Appeals Council. (Tr. 245-246.) Moreover, although the Commissioner herein notes in passing that Clifton "never alleged to the ALJ that she was disabled pursuant to § 12.05C," the Commissioner does not expressly argue that Clifton has forfeited the issue on appeal. Thus, "[b]ecause a potential forfeiture may itself be forfeited, *see United States v. Turner*, 602 F.3d 778, 783 (6th Cir. 2010), we . . . may decide whether the listing applies to this case." *Sheeks,* 544 Fed. Appx. at 641.

[9]The Commissioner does not argue that Clifton's IQ scores are not valid for purposes of Listing 12.05C.

19

Moreover, the ALJ expressly found that Clifton suffered the severe impairment of major depression and, further, that it imposed a significant, work-related functional limitation.  (Tr. 16-20.)  Based on the above, the Court finds there is a substantial question as to whether Clifton has satisfied this requirement of Listing 12.05C.

The Court also finds Clifton has raised a substantial question as to whether she has satisfied the requirements of the introductory paragraph of Listing 12.05; i.e., significantly subaverage general intellectual functioning; deficits in adaptive functioning; and, evidence that the condition began before age 22.  *See Sheeks*, 544 Fed. Appx. at 641.  Evidence in the record indicates Clifton consistently reported having been in special education and/or "slow learner" classes until she dropped out of school in 10th grade.  (Tr. 372.)  She indicated receiving mostly D's and F's and failing the 9th grade twice.  Clifton also reported that she did not obtain a GED because she failed the pretest.  In addition, she indicated receiving SSI benefits as a child.  Although it is unclear for what impairment she received these benefits, Clifton suggests in a Function Report that her award of benefits may have been based, in part, on a learning disability.  (Tr. 197.)  The Court finds this evidence, combined with her performance IQ of 69, is sufficient to raise a substantial question regarding whether Clifton has met the requirement set forth in Listing 12.05 of significantly subaverage general intellectual functioning.

With regard to deficits in adaptive functioning, the Sixth Circuit has stated that "[a]daptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills."  *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007).  *See also Sheeks*, 544 Fed. Appx. at 642.  Here, there is evidence in the record indicating Clifton has had difficulty with social skills both before and after the age of 22.  Clifton reported to both Dr.

20

Halas and Dr. Konieczny that she had severe behavior problems as a child and, in fact, dropped out of 10th grade because of repeated suspensions due to fighting.  (Tr. 290, 298, 372.)  Moreover, the ALJ acknowledged evidence indicating that, as an adult, Clifton has a poor relationship with her family; no friends; and, is minimally involved in outside social activities.  (Tr. 17.)  The decision also acknowledged that Clifton has "difficulties controlling her temper" and was once fired for getting into an argument with a supervisor.  (Tr. 17.)  Additionally, while the record contains evidence indicating Clifton is able to undertake a number of activities of daily living, there is also evidence suggesting deficits in her present daily living skills.  For example, Dr. Konieczny concluded in December 2010 that Clifton "would appear to require some degree of supervision and monitoring in the management of her daily activities and in handling her financial affairs." (Tr. 373.)  The Court finds that, while certainly not determinative of whether Clifton would, in fact, meet the adaptive functioning deficits requirement of Listing 12.05, the above evidence raises a substantial question as to this issue.

Finally, the Court finds Clifton has identified sufficient evidence to raise a substantial question as to onset before age 22.  Evidence in the record suggests Clifton remained in special education classes until she dropped out of school in 10th grade and, further, that she exhibited deficits in her social skills during this same time period.  Additionally, it is undisputed that Clifton received SSI benefits as a child and there is evidence suggesting she may have been awarded these benefits due to a learning disability.  (Tr.  197.)

The Court finds Clifton has raised a substantial question as to whether she has met or equaled the requirements of Listing 12.05C.  Because the ALJ failed to even mention, much less analyze, the evidence discussed above, the Court finds a remand is required to allow the ALJ the

opportunity to meaningfully consider this issue. In so finding, the Court emphasizes that it is not expressing an opinion as to whether Clifton will ultimately be able to demonstrate that she meets or equals the Listing. Indeed, it is not this Court's place to be the first to weigh the evidence contained in the record and determine whether Clifton is or is not mentally retarded pursuant to Listing 12.05C. *See Fury*, 2012 WL 4475661 at * 3. Rather, this Court's role is to decide whether substantial evidence supports the ALJ's determination. For the reasons discussed above, the Court finds the ALJ's failure to analyze whether Clifton met or equaled the requirements of Listing 12.05C denotes a lack of substantial evidence. *See Blakley v. Comm'r of Soc. Sec.,* 2009 WL 3029653 at * 7 (6th Cir. 2007); *Warren,* 2011 WL 1085884 at * 2.

Accordingly, the Court finds a remand is necessary to afford the ALJ the opportunity to evaluate whether Clifton has met or equaled the requirements of Listing 12.05C. As this matter is being remanded for further proceedings, and in the interests of judicial economy, the Court will not consider Clifton's remaining assignments of error.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision is VACATED and the case is REMANDED*, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: July 1, 2014

22